**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-CV-3698-SKC

CARLOS PINTO-RIOS,

      Plaintiff.

v.

TYLER S. BROWN,
THOMAS HOBAUGH,
CHRISTOPHER WENZEL,
JEFFIANO PALAZZOLO,
BARBARA DUDE,
JOHN CRAFT,
MATTHEW SMITH,
COLLIN ROLL,
JOHN ROHDE,
CODY HOUGHTALING,
MATTHEW MILLER,
JAKOB DAVIS,
PAUL COOK,
JEREMY HERKO,
SHANE PURCELL,
THOMAS TRISKA,
MICHAEL GENTRY,
KATIE BLACK,
KERRY PRUETT,
KATY KELLER,
SUSAN GREENWALD,
STACIE HENGY,
MICAH RHOAD, and
WELLPATH, LLC

      Defendants.

_____

**FIRST COMPLAINT AND JURY DEMAND**

_____

1

Plaintiff, Carlos Pinto-Rios, by and through its attorneys of the Civil Rights Litigation Group, PLLC, hereby submits this First Complaint and Jury Demand, and alleges as follows:

## INTRODUCTION

1.      When Plaintiff Carlos Pinto-Rios was first arrested and detained at the Arapahoe County Detention Center he had all of his fingers and was physically healthy. Ten days later, he was hospitalized for severe dehydration, acute renal failure, and severe frostbite, which required all of his fingers to be amputated. Mr. Pinto-Rios' injuries were the result of Defendants' cruel and inhumane treatment by depriving him of adequate heating, clothing/bedding, and water after he was stripped nude in solitary confinement and deliberately left to suffer with obvious serious medical needs.

2.      This is a civil action for damages, pursuant to 42 U.S.C. § 1983 and Colorado common law for Defendants' violation of Plaintiff Carlos Pinto-Rios' rights and other harms. Mr. Pinto-Rios seeks compensation for the injuries he suffered while the jail staff ignored his deteriorating and life-threatening condition, which caused him to endure pain and suffering, disabilities, emotional distress, medical care, and other damages and injuries needlessly caused by the Defendants' deliberate choice to not take rudimentary care of Mr. Pinto-Rios while he remained helpless and hopeless in the custody and care of the Arapahoe County Detention Center.

## JURISDICTION AND VENUE

3.      Plaintiff's claims are brought pursuant to 42 U.S.C. §1983 and the Constitution and laws of the United States and state law.

4.      This Court has jurisdiction of the subject matter pursuant to 28 U.S.C. §1331.

5.      Supplemental jurisdiction over state law claims is conferred by 28 U.S.C. §1367.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because all the events alleged herein occurred in the State of Colorado.

7.      Jurisdiction supporting the Plaintiff's claim for attorney's fees and costs is conferred by 42 U.S.C. §1988.

## PARTIES

8.      Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

9.      Plaintiff, Carlos Pinto-Rios, was at all times relevant to this Complaint, a resident of the State of Colorado. At all times relevant to this Complaint, Mr. Pinto-Rios was a pretrial detainee at the Arapahoe County Detention Center ("ACDC") in Centennial, CO.

10.     Defendant Tyler S. Brown was, at all times relevant to the subject matter of this Complaint, the Sheriff of Arapahoe County and was responsible for the medical care and conditions of ACDC, as well as all policies, procedures and training required to provide adequate medical care to detainees in the jail under his supervision. Sheriff Brown was at all relevant times a law enforcement officer and acting under color of law. He is hereby identified in his individual capacity as a supervisor and his official capacity as Sheriff.

11.     Defendant Sheriff's Deputies Thomas Hobaugh, Christopher Wenzel, Jeffiano Palazzolo, John Craft, Matthew Smith, Collin Roll, John Rohde, Cody Houghtaling, Matthew Miller, Jakob Davis, Paul Cook, Jeremy Herko, Shane Purcell, Thomas Triska, and Michael Gentry, and Classifications Specialist Katie Black (the "Jail Defendants") were, at all times relevant to the subject matter of this Complaint, employed as law detention officers by and for the

ACDC. They were at all relevant acting under color of law as agents of the Sheriff and Arapahoe County. They are hereby identified in their individual capacities.

12.      At all times relevant to the Complaint, Correct Care Solutions, LLC, now known as Wellpath LLC ("Wellpath, LLC"), contracted with ACDC to provide medical services to detainees/inmates at ACDC.

13.      Defendant Katy Keller was at all times relevant to this Complaint employed with Wellpath LLC as a Mental Health Professional. She was acting under color of law in her capacity as a jail medical provider and is identified in her individual capacity.

14.      Defendant Kerry Pruett was at all times relevant to this Complaint employed with Wellpath LLC as a Mental Health Professional. She was acting under color of law in her capacity as a jail medical provider and is identified in her individual capacity.

15.      Defendant Susan Greenwald was at all times relevant to this Complaint employed with Wellpath LLC as an RN. She was acting under color of law in her capacity as a jail medical provider and is identified in her individual capacity.

16.      Defendant Stacie Hengy was at all times relevant to this Complaint employed with Wellpath LLC as an RN. She was acting under color of law in her capacity as a jail medical provider and is identified in her individual capacity.

17.      Defendant Micah Rhoad was at all times relevant to this Complaint employed with Wellpath LLC as an RN. He was acting under color of law in his capacity as jail medical provider and is identified in his individual capacity.

## BACKGROUND FACTS

18.     Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

19.     It is well-known and publicly known that ACDC is falling apart and operates with many health and sanitation problems and cannot adequately care for inmates. According to the Arapahoe County government website, ACDC is "outdated and dangerous."

20.     Defendant Sheriff Brown stated publicly that "the infrastructure in [ACDC] is failing." The building structure is failing with leaking roofing and crumbling walls, leaking gas lines, electrical issues, and HVAC problems, resulting in insufficient heating and insulation from the elements. The plumbing is corroded and failing, resulting in raw sewage backups into living spaces, regular flooding and standing water collecting on the floors inside the jail, and mold problems – all contributing to a damp and cold environment. Certain cells and areas are known to have uninhabitable conditions, including cold temperatures and moisture problems.

21.     ACDC is grossly overcrowded housing 1,400 inmates in a facility designed for 386 people. ACDC only has twenty cells for inmates with severe medical issues and behavioral health issues. Administrative Manager Carl Anderson has stated that there is not enough room to provide all the medical and mental health services that are needed. Overcrowded jails such as ACDC can transfer detainees/inmates to other jail facilities to ensure that inmates receive adequate care that the overcrowded jail is unable to provide.

22.     Since at least 2016, inmates, detention officers, and Arapahoe County government officials have repeatedly complained about the dangerous conditions posed by the conditions in ACDC and the lack of medical care.

23.    On December 17, 2018, Plaintiff Carlos Pinto-Rios was arrested in Greenwood Village, Colorado.

24.    Mr. Pinto-Rios suffers from type-1 bipolar disorder and has Asperger's syndrome. Prior to being arrested, Mr. Pinto-Rios had been experiencing a manic and/or psychotic episode with paranoia, delusions, and/or hallucinations.

25.    At the time of arrest, Mr. Pinto-Rios asked officers to help him get mental health treatment, but instead was arrested and transported to ACDC.

26.    At ACDC, Mr. Pinto-Rios again requested mental health treatment, but was, instead, placed in a cell with another arrestee/detainee without mental health treatment.

27.    While incarcerating from December 17, 2018 to December 27, 2018, Mr. Pinto-Rios was unmedicated for his type-1 bipolar disorder and was severely mentally ill causing him to have behavioral problems he was unable to control and difficulties for ACDC personnel.

28.    While in ACDC, Mr. Pinto-Rios told jail personnel that he wanted to kill himself.

29.    On or about December 19, 2019, following an altercation between Mr. Pinto-Rios and ACDC personnel, jail guards entered Mr. Pinto-Rios' cell, forcibly stripped Mr. Pinto-Rios naked, and placed him in a solitary confinement cell on suicide watch.

30.    Mr. Pinto-Rios' solitary confinement cell was a small cell with cement walls and was empty except for a hole in the floor for a toilet and food waste that can be "flushed" periodically by jail personnel. The cell was monitored on closed-circuit television and by officers conducting rounds through a small window with a shutter that opens and closes from the outside.

31.    On suicide watch, jail deputies are required to check on detainees/inmates at continuous and regular 15-minute intervals. Accordingly, they were regularly required to observe

the conditions of the cell and Mr. Pinto-Rios' physical condition, as well as daily life activities such as sleeping, standing, lying down, walking, and eating, frequently.

32.     Additionally, jail medical personnel were required to check on Mr. Pinto-Rios' medical condition daily, including providing medications, vitamins, and taking vital signs.

33.     Mental health personnel were required to interview and assess Mr. Pintos-Rios at regular intervals.

34.     Following the altercation on December 19, 2018, ACDC personnel knowingly and deliberately place Mr. Pinto-Rios in a cell known to have moisture problems and lack heating causing it to reach freezing cold temperatures below 32 degrees as a punitive measure for his behavior and causing problems for ACDC personnel.

35.     For ten days, Mr. Pinto-Rios sat in a damp and freezing cold solitary confinement cell that was so cold it caused Mr. Pintos-Rios to continually shiver, shake, and to urinate on himself. Mr. Pinto-Rios was naked in the freezing solitary cell except for a compression vest and only given a small blanket and a thin cloth bag for sleeping that were so small they could not cover his whole body.

36.     While in solitary, Mr. Pinto-Rios bundled himself in the blanket and bag in an attempt to keep warm. However, due to the small size of the blanket and bag and his height, neither item would completely cover him, or keep him warm, and parts of his body were constantly exposed to the frigid cold and in constant contact with the freezing floor and moisture. Desperately trying to keep warm he would lay near the hole to try to capture the scant heat emanating from the hole despite the horrific smell of unflushed human waste, uneaten food remains, remnants of waste, and sewer gas.

37.     Hypothermia and frostbite, also known as cold-related illness, develop when a person is subjected to cold temperatures. With frostbite, a person's skin and underlying tissue becomes damaged and dies. With hypothermia, a person cannot maintain their body temperature and will lose blood circulation in their extremities which can lead to gangrene and cause the victim to experience shivering, fatigue/exhaustion, confusion, drowsiness, decreased consciousness, and other symptoms. Grade 2 frost-bite presents with swelling and skin will turn from reddish to a paler color and sometimes appear blue and blisters may develop. Grade 3 frostbite presents with bluish skin color and blisters may develop. Following rewarming, the skin will appear black and hard. Wet environments accelerate and exacerbate cold-related illness because contact with moisture, including wet clothing, draws heat away from the body.

38.     Over the course of approximately five days from December 23, 2018 to December 27, 2018 while Mr. Pinto-Rios was in solitary confinement, his condition deteriorated. He suffered from dehydration, hypothermia and/or frostbite to his fingers, toes, and nose, which ultimately led to necrosis, gangrene, and he went into renal failure. He became dangerously dehydrated and was denied water despite his pleas that he was very thirsty and had not had water in days.

39.     Over this critical time period, Mr. Pinto-Rios' grew fatigued, drowsy, and confused. He lost consciousness at various times. His face lost color and grew pale. His fingers and toes swelled and formed blisters. His fingers and toes turned visibly purple and then black. His fingers turned necrotic and gangrenous. As his kidneys failed, he became fatigued, confused, nauseous, weakness, among other symptoms. He became confused and disoriented saying his head felt funny and he was not feeling well and became lethargic – all symptoms of dehydration and hypothermia.

The symptoms of his condition would have been obvious to anyone who viewed and/or check on him inside the cell.

40.     Also over this time period, Mr. Pinto-Rios blacked out or otherwise lost awareness from his deteriorating condition. He experienced nightmares and/or hallucinations and otherwise devolved into serious mental health disarray.

41.     Each of the individual Defendants, at different times as detailed further below, personally observed the uninhabitable and inhumane conditions of Mr. Pinto-Rios' cell and his severe and continually deteriorating physical and mental condition that would have been obvious to any layperson.

42.     On December 23, 2018, Deputies Craft, Dube, Palazzolo, Smith, and Roll were on duty and the deputies were regularly and continuously checking on Mr. Pinto-Rios at 15-minute intervals because Mr. Pinto-Rios was on suicide watch. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose.

43.     These deputies ignored the conditions in the cell and Mr. Pinto-Rios' physical symptoms that indicated he was obviously suffering from a serious health condition.

44.     The above-named deputies would have also observed that Mr. Pinto-Rios was not being given water and/or drinking water. The deputies, by virtue of being human, and in attending to inmates' basic living necessities in the past, knew or should have known of an inmate's need for drinking water and that there was a likelihood that he would suffer from dehydration in the

cell. Despite the obvious risks of continued dehydration and human suffering that resulted, the deputies deliberately ignored that he needed drinking water.

45.     On December 23, 2018, Defendants Kerry Pruett and Stacie Hengy observed Mr. Pinto-Rios and provided him with vitamins. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition.

46.     On December 24, 2018, Defendant Deputies Dube, Roll, Smith, Rohde, and Wenzel were on duty and regularly and continuously checking on Mr. Pinto-Rios at 15-minute intervals because Mr. Pinto-Rios was on suicide watch. Also on or about December 24, 2018, Defendant Herko observed and/or interacted with Mr. Pinto-Rios and informed the court that they would not be able to bring him to court. The deputies would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition.

47.     The above-named deputies would have also observed that Mr. Pinto-Rios was not being given drinking water and/or drinking water. The deputies, by virtue of being human, and in attending to inmates' basic living necessities in the past, knew or should have known of an inmate's need for drinking water and that there was a likelihood that he would suffer from dehydration in

the cell. Despite the obvious risks of continued dehydration and human suffering that resulted, the deputies deliberately ignored that Mr. Pinto-Rios needed drinking water.

48.     On December 24, 2018, Defendant Micah Rhoad observed Mr. Pinto-Rios and provided him vitamins. He would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition.

49.     On December 25, 2018, Defendants Hengy, Susan Greenwald, and Katy Keller, observed Mr. Pinto-Rios and provided him vitamins. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose, and lethargy but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition.

50.     Defendant Keller spoke to Mr. Pinto-Rios and he stated wanted water and said he had not gotten water for days. She asked deputies to bring him water and stated they would do so but did not. She did nothing to ensure that Mr. Pinto-Rios was actually provided drinking water, despite her knowledge that he badly needed it.

51.     On December 25, 2018, Defendant Deputies Hobaugh, Miller, Davis, Smith, and Houghtaling were on duty and regularly and continuously checking on Mr. Pinto-Rios at 15-minute intervals because Mr. Pinto-Rios was on suicide watch. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration

and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' and his symptoms of dehydration and kidney failure.

52.     The above-named deputies heard and understood that Mr. Pinto-Rios requested and was desperate for drinking water. The deputies, by virtue of being human, and in attending to inmates' basic living necessities in the past, knew or should have known of an inmate's need for drinking water, and that there was a possibility – even likelihood from the notice Mr. Pinto-Rios gave that he suffered from dehydration in the cell. Despite the obvious risks of continued dehydration and human suffering that resulted, the deputies deliberately ignored that Mr. Pinto-Rios needed and requested drinking water.

53.     On December 26, 2018, Defendant Rhoad provided vitamins to Mr. Pinto-Rios. Also on December 26, 2018, Defendant Keller observed and spoke to Mr. Pinto-Rios and he complained that his head felt funny and that he was very thirsty. She asked deputies to bring him water and they stated they would do so but did not.

54.     Defendants Rhoad and Keller would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition and his signs of hypothermia, dehydration and/or kidney failure, including increased lethargy, confusion, and decreased consciousness. They denied Mr. Pinto-Rios water despite his request and would have also observed and deliberately ignored that Mr. Pinto-Rios was not being given water.

55.     On December 26, 2018, Defendant Deputies Davis, Cook, Wenzel, Craft, Smith, and Hobaugh were on duty and regularly and continuously checking on Mr. Pinto-Rios at 15-

minute intervals because Mr. Pinto-Rios was on suicide watch. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' his symptoms of hypothermia, dehydration and/or kidney failure including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

56.     The above-named deputies heard and understood that Mr. Pinto-Rios requested and was desperate for drinking water. The deputies, by virtue of being human, and in attending to inmates' basic living necessities in the past, knew or should have known of an inmate's need for drinking water, and that there was a possibility – even likelihood from the notice Mr. Pinto-Rios gave that he suffered from dehydration in the cell. Despite the obvious risks of continued dehydration and human suffering that resulted, the deputies deliberately ignored that Mr. Pinto-Rios needed and requested drinking water.

57.     Between December 23, 2018 and December 26, 2018, Defendant Classifications Specialist Katie Black directed mental health personnel not to examine Mr. Pinto-Rios despite obvious symptoms that would have put any layperson on notice that his mental health was degrading and that he needed physical and mental health attention.

58.     Defendant Black, as an employee responsible for the placement of inmates in cells and was regularly in the jail to witness environmental conditions and inmates, knew of the problems with the jail and the conditions in Mr. Pinto-Rios' cell and she would have felt and/or observed the freezing temperatures and lack of heating. She also would have known that inmates, including Mr. Pinto-Rios were provided inadequate clothing and bedding. When she observed Mr.

Pinto-Rios she would have observed the lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' his symptoms of hypothermia, dehydration and/or kidney failure including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

59.     On December 26, 2018, Defendant Deputies Davis, Cook, Wenzel, Craft, Smith, and Hobaugh were on duty and regularly and continuously checking on Mr. Pinto-Rios at 15-minute intervals because Mr. Pinto-Rios was on suicide watch. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' his symptoms of hypothermia, dehydration and/or kidney failure including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

60.     On December 26, 2018, on or about 10:48 a.m., Defendant Deputies Shane Purcell, Thomas Triska, and/or Michael Gentry transported Mr. Pinto-Rios to and from court. Mr. Pinto-Rios had to be transported by wheelchair to court due to his condition and weakness/fatigue causing him to be unable to ambulate himself. Deputies Purcell and/or Triska wrapped his hands in blankets to obscure their swollen and discolored condition from view.

61.     In court, the presiding judge observed that Mr. Pinto-Rios appeared to be very sick, weak, and pale.

62.     Deputies Shane Purcell, Thomas Triska, and/or Michael Gentry ignored his obvious, serious medical needs and took him back to jail on or about 11:45 a.m. They did not take him to the hospital or take other steps to ensure Mr. Pinto-Rios received medical care.

63.     In the course of transporting Mr. Pinto-Rios to and from his cell, Deputies Shane Purcell, Thomas Triska, and/or Michael Gentry would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' his symptoms of hypothermia, dehydration and/or kidney failure including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

64.     On December 27, 2018, Defendant Keller observed and spoke to Mr. Pinto-Rios. He stated that he was confused and not feeling well. She would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical severe condition and his symptoms of hypothermia, dehydration and/or kidney failure, including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

65.     On December 27, 2018, Defendant Deputies Hobaugh and Wenzel were on duty and regularly and continuously checking on Mr. Pinto-Rios at 15-minute intervals because Mr. Pinto-Rios was on suicide watch. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and

nose but ignored the conditions in the cell and Mr. Pinto-Rios' physical condition and his signs of hypothermia, dehydration and/or kidney failure including increased lethargy, confusion, and fatigue/weakness and decreased consciousness.

66.     The above-named deputies heard and understood that Mr. Pinto-Rios requested and was desperate for drinking water. The deputies, by virtue of being human, and in attending to inmates' basic living necessities in the past, knew or should have known of an inmate's need for drinking water, and that there was a possibility – even likelihood from the notice Mr. Pinto-Rios gave that he suffered from dehydration in the cell. Despite the obvious risks of continued dehydration and human suffering that resulted, the deputies deliberately ignored that Mr. Pinto-Rios needed and requested drinking water.

67.     On December 27, 2018, on or about 2:00 p.m., Nurse Grossaint observed that Mr. Pinto-Rios had severe frostbite on his hands and feet and asked Dr. Jeffrey Peterson to examine him.

68.     On December 27, 2018 on or about 2:25 p.m., Dr. Peterson examined Mr. Pinto-Rios and ordered him to be taken to the hospital by ambulance.

69.     As a result, Mr. Pinto-Rios was taken to Parker Adventist Hospital. He was diagnosed with severe dehydration, acute renal failure, necrosis, and dry gangrene due to frost-bite. By this time, his condition was life-threatening. He had black cyanosis on his nose and all ten fingers and toes. The frostbite to his fingers was Grade 3 and the frostbite to his toes was Grade 2. At this time, he would likely lose fingers and medical professionals believed his fingers would likely auto-amputate (fall off on their own) over time. He was discharged to jail on December 29, 2018 on or about 11:17 a.m.

70.    On December 30, 2019, Mr. Pinto-Rios was re-admitted to Parker Adventist Hospital due to severe pain in his fingers and toes, being unable to walk, and being unable to perform daily life activities.

71.    On January 2, 2019, the tips of all of his fingers excluding his thumbs had to be amputated.

72.    The damage to his toes took months to heal and he had to live with continuous open wounds.

73.    Over the course of the preceding ten days leading up to Mr. Pinto-Rios going to the hospital, the named Defendants as well other medical and mental health personnel and jail guards observed the conditions in Mr. Pinto-Rios' cell and his deteriorating physical condition. They would have felt and/or observed the freezing temperatures and lack of heating, lack of adequate clothing and bedding, and that Mr. Pinto-Rios was suffering from cold-related illness, including changes in coloration and blistering to his fingers, toes, and nose but ignored the conditions in the cell and Mr. Pinto-Rios' signs of hypothermia, dehydration and/or kidney failure. They would have also observed and ignored that Mr. Pinto-Rios was not being given water and/or drinking. None of them acted to help save Mr. Pinto-Rios from the conditions of his confinement, his physical distress, or mental health deterioration.

74.    Despite knowing of the conditions of the cell and observing Mr. Pinto-Rios suffering, ACDC personnel, including the above-named Jail Defendants, knowingly kept Mr. Pinto-Rios in these inhumane conditions for ten days and chose not to transfer him to a different cell, another jail, or to the hospital.

75.     As Sheriff, Defendant Sheriff Brown was responsible for the management of and the conditions of ACDC and personally visits the jail regularly. Defendant Sheriff Brown has personal knowledge of the above-described conditions and the need to correct them. As such, Defendant Sheriff Brown had information and personal knowledge regarding the need to cure, correct or address the dangerous conditions of the jail, including inadequate heating, clothing/bedding, and water and the negligence and risk of serious harm to Mr. Pinto-Rios and other detainees/inmates. However, he willfully and wantonly affirmatively acted or refused to act in reckless disregard for the rights and safety of ACDC detainees/inmates, including Mr. Pinto-Rios. Despite having been given notice and information from various sources about the dangerous health conditions of the jail, Defendant Sheriff Brown did not abate the unhealthy conditions of the jail and deliberately ignored the dangerous condition(s) and the medical dangers to those who were or could be afflicted.

76.     Defendant Sheriff Brown knowingly ignored and disregarded that ACDC did not have appropriate medical staff, supervision, or management necessary to timely attend to/treat detainees/inmates who entered the facility or otherwise become severely ill while in the facility as evidenced by the fact that the Defendants, composed of no less than sixteen detention officers, a classifications specialist, and five medical professionals, observed Mr. Pinto-Rios' severe hypothermia and/or frostbite, dehydration, and progressive deterioration over ten days until he had to be hospitalized and his condition was life-threatening and he would lose his all fingers.

77.     Defendant Sheriff Brown knowingly ignored and disregarded that ACDC personnel were inadequately trained and supervised to ensure that detainees/inmates are provided with adequate heating, clothing/bedding, and water.

18

78.     Defendant Sheriff Brown knowingly ignored and disregarded that ACDC personnel were inadequately trained to recognize the signs/symptoms of serious medical needs of its detainees/inmates, including frostbite, hypothermia, necrosis, dry gangrene, dehydration, and renal failure, nor to treat those detainees/inmates in any manner as evidenced by the fact that the Defendants, composed of no less than sixteen detention officers, observed Mr. Pinto-Rios' severe hypothermia and/or frostbite, dehydration, and progressive deterioration over at least ten days until he had to be hospitalized and his condition was life-threatening and he would lose his all fingers.

79.     Defendant Sheriff Brown knowingly instituted, permitted, acquiesced in, or encouraged a custom, policy and/or practice at ACDC of placing detainees/inmates in solitary confinement cells which lack adequate heat in the winter-time, clothing them with only a compression vest, and providing them with only a thin blanket and bag to clothe themselves/sleep. This custom, policy, and/or practice was reasonably calculated to cause serious physical and mental damage and/or recklessly posed a risk of serious harm to Mr. Pinto-Rios and other detainees/inmates.

80.     Defendant Sheriff Brown knowingly permitted, acquiesced in, encouraged, or directed ACDC detention officers to engage in a custom, policy, and/or practice of placing detainees/inmates in solitary confinement cells and subjecting them to such inhumane conditions, such as a lack of adequate heating, clothing/bedding, and water, as a punitive and/or retaliatory measure for detainees/inmates who were assaultive, difficult, or otherwise uncooperative with ACDC personnel. This custom, policy, and/or practice was reasonably calculated to cause serious physical and mental damage and/or recklessly posed a risk of serious harm to Mr. Pinto-Rios and other detainees/inmates.

81.     The incident caused Mr. Pinto-Rios severe pain and suffering, disability, physical impairment, emotional distress, pain and suffering, loss of enjoyment of life, economic injuries including significant medical costs, inconvenience, and other costs and expenses. He will be disabled for the rest of his life.

82.     These injuries are directly and proximately caused by the actions of Defendants in knowingly disregarding their duty to adequately protect and exercise due care for Mr. Pinto-Rios while he was in their custody, knowingly ignoring that ACDC personnel were inadequately trained and supervised, and their deliberate indifference to Mr. Pinto-Rios' obvious, serious medical needs and inhumane living conditions and/or negligence.

83.     Defendants violated Mr. Pinto-Rios' civil rights by ignoring the conditions of his cell, including lack of adequate heating in freezing winter temperatures, lack of adequate clothing/bleeding, and lack of water, subjecting Mr. Pinto-Rios to punishment that Defendants knew or should have known would cause him serious physical and emotional damage, and knowingly, recklessly, and intentionally disregarded an obvious, serious risk to Mr. Pinto-Rios by ignoring and not treating his obvious, serious medical needs. Defendants' actions were done knowingly, voluntarily, recklessly, with wanton and willful disregard for the personal safety of Mr. Pinto-Rios, and the actions of the Defendants displayed deliberate indifference to the physical and mental well-being of Mr. Pinto-Rios.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. §1983 – Conditions of Confinement/Deliberate Indifference**
(*Against the Jail Defendants*)

84.     Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

85.     At all times relevant to the Complaint, Mr. Pinto-Rios was in custody and care of the Jail Defendants.

86.     The Jail Defendants acted under the color of law.

87.     At all times relevant to this Complaint, Mr. Pinto-Rios was a pre-trial detainee.

88.     During his confinement at ACDC, Mr. Pinto-Rios was subjected to inhumane conditions by the Jail Defendants, including inadequate heating and inadequate clothing/bedding for him to withstand the cold winter temperatures, not providing him water, and denying him access to medical care, placing his health and welfare at substantial risk.

89.     That these inhumane conditions were known to the Jail Defendants and no efforts were taken to remedy the conditions and such conditions were deliberately permitted to continue.

90.     These conditions amounted to punishment of Mr. Pinto-Rios in violation of the Eighth Amendment right against cruel and unusual punishment made applicable to pre-trial detainees by the 14th Amendment.

91.     Jail officials are required "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir.1998).

92.     The conditions of Mr. Pinto-Rios' confinement bear no rational relationship to the legitimate nonpunitive purposes of ACDC or excessive in relation to that purpose.

93.     The acts or omissions of each Defendant caused Mr. Pinto-Rios damages as described above.

94.     The acts or omissions of all Defendants were the legal and proximate cause of Mr. Pinto-Rios' injuries.

95.     The actions of Defendants as described herein intentionally deprived Mr. Pinto-Rios of due process and the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

96.     Defendants' actions and inaction violated Mr. Pinto-Rios' right to be free from cruel and unusual punishment while being incarcerated within the government-run detention facility, and have subjected Mr. Pinto-Rios to a deprivation of his rights, privileges, and immunities secured by the federal Constitution.

97.     Defendants' deliberate, intentional, willful, and wanton disregard to the obvious, inhumane and unsafe conditions of the cell and disregard for the physical well-being of Mr. Pinto-Rios violated Mr. Pinto-Rios' rights under the Fourteenth Amendment to the United States Constitution.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. §1983 – Deliberate Indifference
#### (*Against the Medical Defendants*)

98.     Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

99.     At all times relevant to the Complaint, Mr. Pinto-Rios was under the care and treatment of the medical staff at ACDC, including Defendants Pruett, Keller, Greenwald, Hengy, and Rhoad (the "Medical Defendants").

100.    The Medical Defendants were acting under color of state law in their actions (and inaction) which occurred on or about December 17-December 27, 2018.

101.    The named Defendants knew or should have known of the conditions in Mr. Pinto-Rios' solitary confinement cell and the injuries that he sustained as a result.

102.    The named Defendants acted with deliberate indifference to Mr. Pinto-Rios' obviously serious medical needs and constitutional rights in knowingly depriving him of timely and appropriate medical treatment. They did so despite his obvious serious medical needs, placing him at risk of substantial physical harm.

103.    The acts or omissions of the named Defendants were conducted within the scope of their official duties and employment. The acts or omissions of all Defendants were the legal and proximate cause of Mr. Pinto-Rios' injuries.

104.    The acts or omissions of each Defendant caused Mr. Pinto-Rios damages as described above.

105.    The actions of Defendants as described herein intentionally deprived Mr. Pinto-Rios of due process and the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

106.    Defendants' actions and inaction violated Mr. Pinto-Rios' right to be free from cruel and unusual punishment while being incarcerated within the government-run detention facility, and have subjected Mr. Pinto-Rios to a deprivation of his rights, privileges, and immunities secured by the federal Constitution.

107.    Defendants' deliberate, intentional, willful, and wanton disregard to the obvious, serious medical needs of Mr. Pinto-Rios, posed by Defendants' disregard for the physical well-being of Mr. Pinto-Rios, and the lack of provision of timely or adequate medical care violated Mr. Pinto-Rios' rights under the Fourteenth Amendment to the United States Constitution.

108.    Defendants' conduct in violating Mr. Pinto-Rios' rights as described herein shocks the conscience and is intolerable to society's standards of fundamental fairness.

109.    Mr. Pinto-Rios was and is entitled to reasonable protection from this sort of harm by those in charge of the jail.

### THIRD CLAIM FOR RELIEF
**42 U.S.C. §1983 – *Monell* Claim**
**(*Against Defendant Sheriff Brown in His Official Capacity*)**

110.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

111.    Sheriff Tyler S. Brown was at all relevant times, policymaker for Arapahoe County whose edicts or acts may fairly be said to represent Arapahoe County's official policy, as Sheriff Brown established policies, procedures, customs, and/or practices for ACDC.

112.    These policies, procedures, customs, and/or practices became the policies, procedures, customs, and practices for Arapahoe County itself.

113.    Defendant Sheriff Brown developed and maintained defective policies, procedures, customs, and/or practices, including inadequately training and/or supervising subordinate employees/contractors regarding medical care to detainees and confinement conditions, exhibiting or resulting in deliberate indifference to the constitutional rights of persons in ACDC, which proximately caused the violation of Mr. Pinto-Rios' constitutional rights as set forth herein.

114.    Defendant Sheriff Brown maintains policies, procedures, customs, and/or practices that tacitly or explicitly authorize the use of punitive measures as those exercised by the Jail Defendants in this matter.

115.    Defendant Sheriff Brown knowingly ignored and disregarding that ACDC personnel were inadequately trained and supervised to ensure that detainees/inmates are provided with adequate heating and clothing/bedding and recognize and respond to serious medical needs.

116.    Defendant Sheriff Brown had a duty to implement, adopt and enforce policies and procedures to prevent detainees/inmates from being subjected to inhumane conditions including, but not limited to, providing adequate heating, clothing/bedding, and water to detainees/inmates.

117.    Defendant Sheriff Brown knew, or had reason to know, that ACDC personnel would foreseeably deprive detainees/inmates of adequate heating, clothing/bedding, water, and/or not adequately identify and respond appropriately to medical emergencies, violating detainees' constitutional rights.

118.    The inadequate training and supervision provided by Defendant Sheriff Brown resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

119.    In light of the duties and responsibilities of those guards and other Arapahoe County personnel who exercised control over individuals incarcerated at ACDC, the need for specialized training and supervision is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Defendant Sheriff Brown is liable for knowingly ignored and disregarding that ACDC personnel were inadequately trained and supervised.

120.    Defendant Sheriff Brown maintained a deliberate indifference to the obvious serious medical needs of jail detainees/inmates, including Mr. Pinto-Rios, knowing that serious consequences could be suffered by Mr. Pinto-Rios by knowingly ignored and disregarding that

ACDC personnel were inadequately trained and supervised. Defendant Sheriff Brown could have and should have pursued reasonable methods for the training and supervision of such employees/contractors, but chose not to do so.

121.    Defendant Sheriff Brown's policies, customs, or practices of inadequate training and supervision of ACDC personnel were the moving forces and proximate cause of the violation of Mr. Pinto-Rios' constitutional rights.

122.    The acts or omissions of Defendant Sheriff Brown caused Mr. Pinto-Rios damages in that he suffered extreme physical and mental pain and injury and disability as described above.

123.    As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Plaintiff suffered injuries, damages, and losses as set forth herein.

124.    The actions of Sheriff Brown as described herein intentionally deprived Mr. Pinto-Rios of due process and the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages.

### FOURTH CLAIM FOR RELIEF
*Common Law Negligence*
**(Against Defendant Brown, the Medical Defendants, and Wellpath, LLC)**

125.    Plaintiff hereby incorporates all other preceding paragraphs of this Complaint as if set forth herein.

126.    Defendant Brown, as Sheriff of the County Jail, was statutorily responsible for the safe and healthy confinement of inmates at the jail, pursuant to C.R.S. § 30-10-511, §§ 17-26-101-102.

127.    Defendant Sheriff Brown breached his duty of reasonable care due to Mr. Pinto-Rios by negligently operating the jail, personally, and by and through his deputies, under the doctrine of *respondeat superior*.

128.    Defendant Sheriff Brown has failed to take reasonable precautions to maintain the jail facility in a manner that does not contribute unnecessarily to the illness of those confined in the jail, and the suffering of those with illnesses at the jail when they become sick and by ignored inhumane cell conditions, including lack of adequate heating in freezing winter temperatures, lack of adequate clothing/bedding, and water.

129.    Defendant Sheriff Brown breached his duty of care to Mr. Pinto-Rios, by negligently training and supervising ACDC personnel with regard to illness, symptoms of illness, recognizing signs of the life-threatening-illness(es), both bore and not bore by the facility, and to respond appropriately so that medical care, follow up care, medication, and/or proper attention could be readily provided to inmates who suffered from the type of medical problems of which Plaintiff suffered.

130.    At the times relevant to this Complaint, Wellpath, LLC employed the Medical Defendants and was responsible for their acts and/or omissions under the doctrine of *respondeat superior*.

131.    Defendant Wellpath, LLC has failed to enact sufficient or appropriate policies, practices, training, record-keeping, or communication regarding inmate health needs to treat and provide appropriate care regarding inmate medical issues in a timely and/or reasonably comprehensive manner.

132.    The Medical Defendants, each, at different times, as further detailed in this Complaint, failed to provide the care that any medical professional in their position would have provided to Mr. Pinto-Rios by not further evaluating and treating him and ignoring his symptoms of cold-related illness and severe dehydration and his deteriorating and worsening condition.

133.    Defendants failed to employ appropriate medical equipment, tests, and referrals necessary to sufficiently and timely recognize and/or treat serious inmate medical issues, such Mr. Pinto-Rios' obvious symptoms of cold-related illness and severe dehydration.

134.    Defendants failed to act in accordance with an appropriate standard of care to properly diagnose, treat, and otherwise provide Mr. Pinto-Rios with appropriate and timely medical care.

135.    Defendants breached their duty of care to Mr. Pinto-Rios by negligently failing to appropriately review, evaluate and treat Mr. Pinto-Rios' health condition after he exhibited signs of cold-related illness and severe dehydration.

136.    Defendant Wellpath, LLC breached its duty of care to jail inmates, including Mr. Pinto-Rios, by negligently training and supervising medical staff with regard to disease/illness, symptoms of a disease/illness, recognizing signs of the life-threatening-illness(es), and responding appropriately so that medical care, follow up care, medication, and/or proper attention could be readily provided to inmates who complained of and suffered from the type of medical problems of which Mr. Pinto-Rios suffered.

137.    Defendants had information and personal knowledge regarding the need to recognize and/or treat serious inmate medical issues, such as frostbite, and the negligence that made injury to Mr. Pinto-Rios and other inmates likely. However, these Defendants willfully,

wantonly, and affirmatively acted or refused to act in reckless disregard for the rights and safety of the inmates, including Mr. Pinto-Rios.

138.    As the direct and proximate result or substantial factor of Defendants actions and omissions to act in accordance with appropriate standards of care and established National and Colorado corrections standards, Mr. Pinto-Rios became ill with a life-threatening illness and which illness was unnecessarily aggravated while at the facility.

139.    As a further direct and proximate result or substantial factor of Defendants' actions and omissions to act in accordance with the proper standards of care and established National and Colorado corrections standards, Mr. Pinto-Rios has suffered injuries as listed above, including pain and suffering and permanent disability.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in favor of the Carlos Pinto-Rios, against the Defendants, and award the following:

a.   Compensatory and consequential damages, including damages for physical injury, permanent disability and disfigurement, economic losses, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

b.   Punitive damages against the individual defendants in an amount to be determined at trial;

c.   Pre and post-judgment interest, costs and expert witness fees, reasonable attorney fees by statute, and as allowed by law, and

d.   Any other such other relief that the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully submitted this 21st day of July, 2021.

/s/ Rachel B. Maxam
Raymond K. Bryant, #42586
Rachel B. Maxam, #47711
Civil Rights Litigation Group, PLLC
1543 Champa Street, Suite 400
Denver, CO 80202
Phone: 720-515-6165
Fax: 720-465-1975
Email: raymond@rightslitigation.com
Email: rachel@rightslitigation.com

*Attorneys for Plaintiff*